UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

CIVIL ACTION NO. 5:11-CV-221-KSF

MICHAEL CASTLE                                                                                              PLAINTIFF

vs.                                              **OPINION AND ORDER**

PAUL HOWARD, et al.                                                                                   DEFENDANTS

\* \* \* \* \* \* \* \*

This matter is before the Court on Defendants' motion for summary judgment. For the reasons discussed below, the motion will be granted.

**I.      BACKGROUND**

The present case arises from Plaintiff's arrest for disorderly conduct at a July 24, 2010 little-league baseball game, where his seven-year-old grandson was playing. A Clark County jury found Plaintiff guilty of disorderly conduct on January 13, 2011. On July 14, 2011, Plaintiff filed this action against several individuals of the Clark County Sheriff's Office, both in their individual and official capacities. The complaint alleges false arrest, malicious prosecution, defamation, and excessive force under 42 U.S.C. § 1983 and state law.

For purposes of summary judgment, the following background facts are taken from Plaintiff's account of the facts through depositions and exhibits. Plaintiff, Michael Castle ("Castle"), and his wife live in West Virginia, but they regularly travel to Lexington, Kentucky, where their daughter, son-in-law, and three grandchildren live. Castle supports his grandson Colson's baseball team by attending all games and by purchasing sponsorships for the team. Castle's son-in-law, Ronnie Perry, serves as assistant coach.

On July 24, 2010, Castle and his wife attended the grandson's baseball tournament in Winchester, Kentucky. Even before the game started, there was bad blood between the

grandson's Northern Cal Ripken ("Northern") team and Winchester's Lykins Legends ("Lykins"). The bad blood was mainly between the coaches, parents and grandparents of the two teams. Rancor developed during earlier games from "the two coaches going at each other, and then it just escalated from that to the fans to the grandparents." [Michael Castle Dep., p. 19]. Reportedly, the Lykins' coach threatened to "bash the [Northern] coach's head out with a ball bat." *Id.* In light of the animosity, Castle's daughter, Erin Perry, did not want to attend the game.

The Castles had been at the field "pretty well all day" in tailgating tents with other Northern fans. *Id.* at 22-23. Before the late afternoon game, the Lykins' coach told the Northern fans they could not watch the game from the first-base side of the field where they had been set up. Instead he forced them to move all of their gear to the third-base side. *Id.* at 25-26, 28, 33-34. Then, the coaches argued over the coin toss. *Id.* at 34. After the game started, there were frequent interruptions while the coaches contested most of the umpires' calls. *Id.* at 37. The Northern fans were "very loud and very upset, very – into a lot of times heated exchanges between the two sets of fans." *Id.* at 39. Castle said in general, "you could say that the vast majority of the fans in the bleachers would be very vocal. They were getting very upset. All of the stops and starts and interruptions, frustration just kept building." *Id.* at 40.

After several innings, a heated argument with a lot of profanity started between a Northern grandparent and the Lykins' head coach. *Id.* at 42-43. The coach responded by kissing a muscle on his arm in a taunting fashion. [Ronnie Perry Dep., p. 40]. After witnessing this taunt, the Northern fans got very upset. *Id.* at 41. Castle's daughter told her husband to "do something" to calm down the screaming Northern fans. *Id.* at 41-42. Ronnie Perry responded: "You tell them to be quiet. You know, you got 30 people screaming. You want me to just get mauled?" *Id.* Castle's daughter left the game due to the acrimony. [Erin Perry Dep., pp. 23-25]. A league official threatened to remove the Northern fan if he did not control himself in front of the children. [Michael Castle Dep., pp. 42-43].

2

In the meantime, off-duty Deputy Sheriff Paul Howard was attending his son's game at a different field. [Paul Howard Dep., p. 16]. A parent from his son's team, Angie English, called to say there was a problem at the other field and a concern that some fans or coaches may physically harm the Winchester coach after the game. *Id.* She asked Deputy Howard to come down to that field. *Id.* Deputy Howard told Kenneth Howard (unrelated), a board member for the Winchester Little League, about the call and they both proceeded to the softball field. *Id.* at 23. Deputy Howard described the competitive tension when he arrived as "at a level that wasn't normal competitive tension." *Id.* at 28. Eric Walton, another board member, was at a separate baseball field and received a text from one of the coaches that there was some confrontation between the two coaches and suggesting that he come over to "try to help calm the situation down." [Eric Walton Dep., pp. 9-10]. Walton asked Deputy Howard to stand between the two teams after the game as they shook hands to ensure that the coaches did not fight. [Paul Howard Dep., p. 32].

The facts related by the parties diverge at this point. According to Castle, a group of three or four people walked over and stood behind the canopy tent where he was sitting. [Castle Dep. pp. 53-54]. Castle thought they were Lykins fans who "had come over trying to agitate." *Id.* at 46-47, 53-54. He says the people started talking about the size of Northern's first baseman, and Castle interpreted that as questioning whether the player was too old for the team. *Id.* at 46, 56. Castle became "frustrated" and shouted twice at the people to go back to the other side of the field and leave them alone because they had birth certificates to prove the first baseman's age and they did not need to cheat to win. *Id.* at 47, 56-60; [Deborah Castle Dep., pp. 13-14]. Other observers described Castle as screaming at the group "not to come over and start any shit." [Kenneth Howard Dep., p. 22]. Angie English testified that Castle told the group "not to come over and start shit and he did not want to hear it." [English Dep. p. 14].

Castle claims that Deputy Howard suddenly appeared in front of him as Castle was seated in a folding chair and said "you don't need to be interrupting people's conversations, I'll throw you

3

off this field, something to that effect." [Castle Dep., p. 63]. Castle questioned Howard's authority and claims that Howard then "sucker punched" him across the throat with a hand or forearm and knocked him backwards in his chair into his wife's lap. *Id.* at 64-66. Castle claims Deputy Howard began choking him with two hands while telling him that Howard was a police officer and Castle was under arrest. *Id.* at 67, 69. Castle immediately began screaming for Howard to show him a badge. *Id.* at 70, 74. Castle admits he was able to scream, despite his claim of being choked. *Id.* 68, 70. Castle said Howard then put one hand on his right shoulder and squeezed his shoulder. *Id.* at 69. Castle also claims Howard began twisting his right arm. *Id.* at 72. Nonetheless, Castle never mentioned that anything Howard did caused him physical pain. *Id.* at 85. Castle's wife, who was close by, also never heard any complaint of physical pain and did not herself tell Howard that he was hurting her husband. [Deborah Castle Dep., pp. 21,25].

Deputy Howard disputes Castle's recollection of the facts. He testified Castle became angry with a group of spectators and then refused to calm down after Eric Walton asked him to do so. [Paul Howard Dep. p. 52]. Howard said he approached Castle, advised he was an off-duty deputy sheriff, said the game was almost over, and he needed to calm down. *Id.* at 43,47. Castle instead became more irate and began screaming at Deputy Howard. *Id.* at 49. Castle was observed starting to stand up from his chair "like he was getting ready to punch Deputy Howard." [English Dep., p. 18]. Howard immediately pushed Castle back down into his folding chair, took hold of his arm so he could not punch, and applied a pressure point technique to Castle's sternum to control and subdue him. Howard also rocked Castle's folding chair back onto its back legs so Castle would have less leverage to cause harm. [Paul Howard Dep., pp. 55, 59, 61-63]. Howard told Angie English to call 911. [English Dep., p. 18]. When Castle continued screaming and struggling, Deputy Howard placed him under arrest. [Paul Howard Dep., pp 63-66, 68, 70-71].

Ronnie Perry, Castle's son-in-law, said he thought Deputy Howard was a Lykins fan, and he ran to Castle's tent intending "to knock the holy hell out of [Deputy Howard]." [Ronnie Perry

4

Depo, pp. 69,71-72]. Eric Walton grabbed Perry's legs and told him that Deputy Howard was a police officer. *Id.* Nonetheless, Perry "walked up and I grabbed Paul [Howard] by the shoulder and I turned him around, and I was like, you know, quit." *Id.* at 72. Perry claims that Deputy Howard threatened to arrest him, too. *Id.* at 72.

Someone took two photographs at the time these incidents were occurring. DE 58-10. The first shows Mr. Castle tilted back in his chair with a male hand on his right wrist. Mrs. Castle's arm is clearly visible and her hand is firmly planted over her husband's mouth. *Id.* She said she was "trying to calm the situation down." [Deborah Castle Dep., p. 21]. Castle assumed she put her hand over his mouth "[t]o get me to shut up." [Michael Castle Dep., p. 75]. The second photo shows Castle's arm has been released, but Mrs. Castle's hand is still firmly over his mouth. She also appears to be gripping Castle's left shoulder from behind. DE 58-10, p. 2.

When Castle heard sirens approaching, he says he accepted Deputy Howard as a police officer. [Michael Castle Dep., p. 83]. Deputy Howard was on Castle's left side while escorting him to the parking lot to meet the officers. Castle claims Howard pulled Castle's right arm straight behind his back, pushed it up, and almost lifted him off the ground as they walked to the parking area. *Id.* at 86-89. Mrs. Castle was walking five feet behind and did not believe that Deputy Howard was causing physical harm to her husband. [Deborah Castle Dep., p. 29].

While being escorted, Castle admits he "was still asking to see [Howard's] badge." [Michael Castle Dep., p. 88]. Mrs. Castle apologized to one of the deputies, but Castle told her to "shut up and stand behind me for one time in your life." [Deborah Castle Dep., pp. 31-32]. Castle said his wife was asking the officers to let him go, that they would go home, and she was sorry this happened. Deputy Howard told her she would be his best witness. Castle told her to "shut up and stand behind [him]." [Michael Castle Dep., pp. 90, 92].

At the parking lot, Castle was handcuffed by Deputy Mark Collier. Castle claims that the left handcuff was too tight and that he complained, but Deputy Collier ignored him. [Michael Castle

5

Dep., pp. 99-101]. Castle admitted there was no permanent injury. It caused redness, but not "an injury that I needed a band aid for or anything...." *Id.* at 104. Deputy Collier placed Castle in the back of his cruiser. Castle claims he was in the car with no air conditioning for approximately twenty minutes and that the temperature became uncomfortable. *Id.* at 91, 105-106. Castle says he began banging his shoulder on the car door until Deputy Collier reached in and turned on the air conditioning, which quickly helped. *Id.* at 102-103, 107. Castle's wife was standing near the cruiser the entire time, but was not aware of any issue with the air conditioning. [Deborah Castle Dep., p. 35]. She would have requested it be turned on if she thought he was in distress because of the heat. *Id.* at 35-36. At the jail, while Deputy Collier was writing Castle's citation, Castle asked "who Billy Bad Ass was out there." That is how Castle learned the name of Deputy Howard. [Michael Castle Dep., 108].

In response to the motion for summary judgment, Castle cites to his "impressive" resume. He also claims that he "does not have a criminal record of any kind." DE 61, p. 2. This statement obviously is not true in light of his conviction for Disorderly Conduct on January 13, 2011. *See Id.* at 11. Castle also complains that Deputy Howard violated Clark County Sheriff policies by not carrying a badge or billfold and failed to exercise "common sense" when he did not move his group to the other side of the field. *Id.* at 3-5. Castle's brief does not respond to Defendants' summary judgment arguments on his claims of false arrest, malicious prosecution and defamation. Instead, Castle focuses in his response on the alleged use of excessive force and claims he suffered serious injury to his right arm as a result.

## II. ANALYSIS

### A. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists if there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In other words, the determination must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the moving party shows that there is an absence of evidence to support the nonmoving party's case, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Phillip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). Conclusory allegations are not enough to allow a nonmoving party to withstand a motion for summary judgment. *Id.* at 343. "[A] plaintiff cannot survive summary judgment with an expert's bare opinion on the ultimate issue." *Hirsch v. CSX Transp., Inc.*, 656 F.3d 359, 363 (6th Cir. 2011). Unsworn expert reports are inadmissible hearsay. *Sigler v. American Honda Motor Co.*, 532 F.3d 469, 480-81 (6th Cir. 2008). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson,* 477 U.S. at 252. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).

**B.    Defendant's Motion for Summary Judgment**

In response to the motion for summary judgment, Castle cites to unsworn evidence, such as his resume and an unsworn expert report.[1]  Such evidence cannot be considered in deciding

---

[1] Castle argues that Dr. Martinelli's original report was not stricken and could be cited. DE 61, p. 13. To the contrary, Magistrate Judge Wier ruled on April 27, 2012 that Plaintiff could not offer proof from Dr. Martinelli in his case in chief because the original report was

7

a motion for summary judgment. *Sigler v. American Honda Motor Co.,* 532 F.3d 469, 481 (6th Cir. 2008) (District court improperly considered unsworn expert report in deciding to grant summary judgment). Moreover, even if the evidence were admissible, the claims are without merit.

> 1. Plaintiff's Claims of False Arrest, Malicious Prosecution, Defamation and Assault and Battery Against Deputies Howard and Collier in Their Individual Capacities

When claims are alleged under § 1983 against a government official in his/her individual capacity, a plaintiff must overcome the defense of qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009), quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). When the defense is raised, "the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity." *Baker v. City of Hamilton*, 471 F.3d 601, 605 (6th Cir. 2006).

Plaintiff makes no response to the motion for summary judgment on his claims of false arrest, malicious prosecution, defamation and assault and battery. When nothing is offered in the record to rebut the evidence offered by defendants, no issue of contested material fact exists, and the defendant is entitled to judgment as a matter of law. *Goins v. Clorox Co.*, 926 F.2d 559, 562 (6th Cir. 1991). Accordingly, Deputies Howard and Collier are entitled to summary judgment on their defense of qualified immunity.

Even if Castle had responded in support of these claims, the response would have been futile. Castle's conviction for Disorderly Conduct establishes probable cause for his arrest and prosecution and precludes any challenge to same in a § 1983 action. *Daubenmire v. City of Columbus*, 507 F.3d 383, 390 (6th Cir. 2007). *See also Dier v. City of Prestonsburg*, 480 F.

---

inexcusably late. DE 25. Magistrate Judge Wier also rejected Castle's subsequent effort to file the original report as a rebuttal report. DE 44. Thus, nothing in the original report is admissible evidence for several reasons.

Supp.2d 929, 937 (E.D. Ky. 2007) ("Dier is collaterally estopped from maintaining a claim that, in order to prevail, requires proof of insufficient probable cause to arrest and prosecute Dier for the crimes for which he was convicted."). In *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994), the court held that a § 1983 plaintiff is foreclosed from pursuing a claim that would imply the invalidity of a criminal conviction. *See also Barnes v. Wright*, 449 F3d 709, 716 (6th Cir. 2006)("he may not obtain relief pursuant to § 1983 if such relief would 'imply the invalidity of this conviction'").

Similarly, Castle's state law claims of false arrest and imprisonment must be dismissed. A claim for false arrest requires a plaintiff to establish that the officer lacked probable cause to make the arrest. *See Myers v. City of Louisville*, 590 S.W.2de 348, 349 (Ky. Ct. App. 1979). A conviction on an underlying criminal offense is sufficient to establish probable cause for a later civil action. *Freeman v. Logan*, 475 S.W.2d 636, 638 (Ky. 1972). Accordingly, the claim for false arrest fails as a matter of law.

Castle also has failed to present any evidence to support a claim of defamation. A defamation claim under § 1983 requires proof that the defamatory act resulted in stigma and also resulted in the deprivation of a constitutionally protected right or interest. *Paul v. Davis*, 424 U.S. 693, 712 (1976). "Absent a further injury, such as loss of a government job or loss of a legal right or status, defamation, by itself, does not constitute a remediable constitutional claim." *Voyticky v. Village of Timberlake, Ohio*, 412 F.3d 669, 677 (6th Cir. 2005). Castle has not presented any evidence of the loss of a constitutionally protected right or interest.

Castle also claimed the Deputies defamed him by stating that he violated the statutes regarding disorderly conduct and menacing, by placing these charges in a citation, and by testifying against him in the underlying criminal proceeding. These claims fail as a matter of law because the statements by the officers were subject to an absolute privilege and were true. Statements made by government officials engaged in the discharge of their duties imposed by law are absolutely privileged. *Harwood v. McMurtry*, 22 F. Supp. 572, 573 (D.C. Ky. 1938); *Evans v. Sir*

9

*Pizza of Kentucky, Inc.,* 2010 WL 2365345 at *8 (E.D. Ky. June 11, 2010). Additionally, it is absolutely true that Castle was arrested and charged with violations of disorderly conduct and menacing statutes. Any statements to that effect by the officers were true and not defamatory.

        2.      <u>Plaintiff's Claim of Excessive Force By Officers in Their Individual Capacity</u>

As noted above, when a qualified-immunity defense is raised, "the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity." *Baker,* 471 F.3d at 605. The inquiry turns on two questions: (1) whether a constitutional right has been violated, and (2) whether the right was clearly established. *Smoak v. Hall*, 460 F.3d 768, 777 (6th Cir. 2006). To prevail on a claim of excessive force, a plaintiff must establish that the force used by the officer was not objectively reasonable in light of the facts and circumstances confronting him at the scene. *Graham v. Connor*, 490 U.S. 386,397 (1989). The facts are to be considered from the perspective of a reasonable officer on the scene, including whether the suspect poses an immediate threat to the safety of officers or others and whether the suspect is actively resisting the officers' commands. *Id.* at 396. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the fourth Amendment." *Graham*, 490 U.S. at 397. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 396-97. The question is whether the force used was reasonable under the totality of the circumstances. *Slusher v Carson,* 540 F.3d 449, 455 (6th Cir. 2008).

        *a.*    *Use of force during the initial encounter*

Castle admits there was bad blood between the coaches, parents and grandparents of the two teams. This was exacerbated by the Lykins' coach forcing the Northern fans to move to third base. It was exacerbated even more by the game delays resulting from the coaches disputes among themselves and with the umpires. Castle's son-in-law declined to "do something" as there

were thirty people screaming and he did not want to "just get mauled." [Erin Perry Dep., pp. 23-25]. Castle's daughter left the game because of the animosity. *Id.* A league official threatened to remove an arguing Northern fan if he did not control himself in front of the children.

Castle admits he was frustrated and shouting at persons he erroneously believed to be fans of the opposing team. As Deputy Howard approached, Castle refused to comply with Howard's request that he calm down. Instead, Castle began screaming at Deputy Howard to show him a badge. Angie English testified that Castle started to stand up from his chair "like he was getting ready to punch Deputy Howard." [English Dep., p. 18]. Deputy Howard quickly pushed Castle back into his chair to neutralize any possible threat, grabbed his right arm, and applied a pressure point technique to Castle's sternum to control and subdue him. Deputy Howard also rocked Castle's folding chair back onto its back legs. When Castle continued screaming and struggling, Deputy Howard placed him under arrest. Castle claims he was choked, but only long enough for Deputy Howard to advise he was a police officer and that Castle was under arrest. The physical contact between the parties was very brief – lasting less than thirty seconds. Castle and his wife testified that Castle did not vocalize any pain during this contact.

Castle argues that "nobody testified" that the "plaintiff was doing anything more than nothing and was seated in his chair and making no oral threats or movable threats by doubling up his fist." This statement is refuted by the testimony of Angie English, Castle's conviction for disorderly conduct, and the photograph showing Castle's right fist clenched and his wife's hand covering his mouth to get him to shut up. Castle admitted he was screaming at Deputy Howard. [Castle Dep., p. 67].

Under these circumstances, the force used by Deputy Howard was reasonable and not excessive. Deputy Howard encountered an angry and uncooperative suspect in a hostile crowd. Castle refused to calm down and cooperate even after he was pushed back in his chair and his wife covered his mouth with her hand. Instead, he kept screaming at Deputy Howard to show his badge

and refused to obey orders. An officer is entitled to make a show of force when an individual is refusing to comply with his orders. *Slusher*, 540 F.3d at 455.

The entire initial contact lasted less than thirty seconds, resulted in Castle being tipped back in his chair and unable to threaten the officer, and did not result in any complaint of pain by Castle. Castle had just committed the crime of disorderly conduct in front of Deputy Howard and then refused to cooperate. The Court concludes Deputy Howard's intervention was low level and appropriate.

Alternatively, even if the force were excessive, Castle has not established that a "reasonable officer would understand that what he is doing violates [a constitutional] right." *Saucier v. Katz*, 533 U.S. 194, 202 (2001), overruled on other grounds. Castle has not made that argument and has not cited any authority to support such a claim. Accordingly, Deputy Howard is entitled to summary judgment on the claim that he used excessive force during the initial encounter.

Plaintiff makes an additional claim of assault and battery under state law. That claim is equally without merit. Under Kentucky law, public officials are entitled to qualified immunity when they perform discretionary acts in good faith and within their scope of authority. *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001). Once an official establishes the act was discretionary and within his scope of authority, the burden shifts to the Plaintiff to establish the act was not performed in good faith. Bad faith requires a showing that the public employee knew or should have known that his actions violated the plaintiff's rights or if the officer willfully or maliciously intended to harm the plaintiff. *Id.* at 523.

Kentucky law recognizes that individuals are privileged under certain circumstances to use reasonable force, including to make an arrest. KRS 503.090. Deputy Howard was justified in using a reasonable amount of force to subdue and arrest Castle for his disorderly conduct. Moreover, even if Deputy Howard used excessive force, he is entitled to qualified immunity. Determining the amount of force required to effect an arrest is a discretionary act. *See Woosley v. City of Paris*,

591F. Supp.2d 913, 922 (E.D. Ky. 2008). Accordingly, Castle must establish that Deputy Hoard knew his actions violated Castle's rights or maliciously intended to harm him. There is no evidence to support either basis for liability. Deputy Howard is entitled to qualified immunity on Castle's state law claims of assault and battery.

### b. *Use of force while escorting Castle from the field*

Castle admits he continued challenging Deputy Howard to show his badge while being escorted to the parking lot, despite claiming to have accepted him as an officer when he heard sirens coming. [Michael Castle Dep., pp. 83, 88]. Castle was also yelling at his wife to shut up when she was apologizing for the situation. [Deborah Castle Dep., pp. 31-32; Michael Castle Dep., pp. 90, 92]. It was reasonable for Deputy Howard to maintain physical control over Castle while escorting him. Assuming for the purposes of this motion that the hold was as described by Castle, it was still reasonable in light of Castle's continued anger and animosity. *See Ramos v. Hicks*, 1988 WL 80176 at *2 (S.D.N.Y. July 25, 1988). Castle did not complain of any pain associated with the escort hold, and Mrs. Castle said she followed her husband closely and did not observe anything that caused him pain. Deputy Howard is entitled to qualified immunity on this claim of excessive force.

### c. *Use of force while handcuffing the Plaintiff*

Castle claims Deputy Collier violated his constitutional rights by handcuffing his left wrist too tightly. In the Sixth Circuit, a constitutional violation based on excessive force in handcuffing too tightly requires proof of some physical injury from the handcuffing. *Lyons v. City of Xenia*, 417 F.3d 565, 576 (6th Cir. 2005). A "temporary or minor discomfort is not sufficient injury to state a claim of constitutional magnitude." *Hutson v. Felder*, 2008 WL 4186893 at *4 (E.D. Ky. Sept. 10, 2008). An arrestee must show that the officer used more than *de minimus force*, that the force used was excessive, and he suffered some objectively verifiable injury or actively sought medical attention thereafter. *Leary v. Livingston County*, 528 F.3d 438, 443 (6th Cir. 2008).

In the present case, Castle admitted the handcuffs only made his wrist red and did not even require a band aid. Accordingly, there was no constitutional violation.

### d. Leaving Castle in a police cruiser for twenty minutes

Castle's Response essentially ignores this allegation of a constitutional violation. His belligerence while being arrested and escorted support confining him in a cruiser with the windows rolled up. Castle failed to cite any case law to establish that his confinement to a vehicle for twenty minutes on a hot day while the officers completed their investigation constitutes excessive force. Other courts have found that confinements of ten minutes and one hour are insufficient to constitute excessive force. *Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001) (arrestee left in an unventilated vehicle in the sun for almost an hour did not state a constitutional violation); *Esmont v. City of New York*, 371 F. Supp. 2d 202, 214 (E.D. N.Y. 2005) (officers entitled to qualified immunity on claim of excessive force arising from confinement to a hot car for ten minutes). Even if the confinement could be found to be excessive, Castle failed to cite any precedent to establish that his confinement for twenty minutes constitutes a violation of a clearly established constitutional right. Accordingly, Deputies Howard and Collier are entitled to qualified immunity on this claim.

### 3. Plaintiff's Claims Against Officers in Their Official Capacity

"Official capacity" claims are "only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985), quoting *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, n. 5 (1978). *Monell* held that a government entity can only be responsible for deprivation of rights if the deprivation occurred by reason of a governmental "custom." *Monell*, 436 U.S. at 694-95. There must be an allegation that official policy is responsible for a constitutional deprivation, and the conduct must be so common and repetitive that it amounts to custom. *Id.* at 691.

Castle responds to the summary judgment motion by stating that the Clark County Sheriff's office is liable "under the theory of respondient [sic] superior." [DE 61, p. 13]. However, *Monell* established long ago that official-capacity liability under § 1983 cannot be based on a theory of *respondeat superior*. *Monell*, 436 U.S. at 691.

Castle also argues that Sheriff Perdue failed to properly train his deputies. DE 61, p. 16. To establish such a claim, a plaintiff must prove the county ignored a repeated pattern of constitutional violations. *Slusher v. Carson*, 540 F.3d 449, 457 (6th Cir. 2008). Castle responds to the summary judgment motion with a variety of conclusory allegations having no factual or legal support. DE 61, p 16. Conclusory allegations are not enough to allow a nonmoving party to withstand a motion for summary judgment. *Moore v. Phillip Morris Companies, Inc.*, 8 F.3d 335, 343 (6th Cir. 1993).

The conclusory allegations are followed by a detailed list of allegations regarding Deputy Howard's behavior. DE 61, pp. 16-18. There are no citations to the record. "[T]he nonmoving party has an affirmative obligation to direct the court's attention to those specific portions of the record upon which it seeks to rely to create genuine issues of material fact." *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001). The trial court does not have any duty to search the record to show there is no genuine issue of material fact. *Id.*

Additionally, many of the conclusory statements challenge the facts of his underlying conviction, which Castle is collaterally estopped from doing. *Daubenmire v. City of Columbus*, 507 F.3d 383, 390 (6th Cir. 2007). Most importantly, there is no evidence establishing that the county ignored a repeated pattern of constitutional violations. There is simply a conclusory allegation of a lack of "critical policies," but no evidence establishing what policies were missing or that they were lacking or necessary. Castle's allegations fall far short of the evidence necessary to establish a policy or custom of Clark County sufficient to impose liability. Accordingly, summary judgment is appropriate for all of Castle's official-capacity claims.

### III.  CONCLUSION

**IT IS ORDERED** that:

A.   Defendant's motion for summary judgment on all of Plaintiff's claims [DE 58] is **GRANTED**;

B.   Plaintiff's Objections to Magistrate Judge Wier's July 19, 2012 Order [DE 62] are **OVERRULED AS MOOT**;

C.   Judgment in favor of all Defendants shall be entered contemporaneously with this Opinion and Order; and

D.   The pretrial conference and trial scheduled for September 27, 2012 and October 30, 2012, respectively, are **SET ASIDE**.

This August 31, 2012.



Signed By:
*Karl S. Forester*  KSF
**United States Senior Judge**